# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

BRIAN HELLWEG AND KRISTEN
HELLWEG, individually and on behalf of
all others similarly situated,

No.

      Plaintiff,

**JURY TRIAL DEMANDED**

v.

VOLKSWAGEN GROUP OF AMERICA, INC.,
VOLKSWAGEN AG,

      Defendants.

---

## CLASS ACTION COMPLAINT

Plaintiffs BRIAN HELLWEG AND KRISTEN HELLWEG brings this action on behalf of themselves and on behalf of all persons similarly situated who purchased or leased Defective Vehicles (defined below) manufactured, distributed or sold by Volkswagen for claims under federal and state law. Plaintiffs allege as follows:

### NATURE OF THE CLAIM

1.      Since 2009, Volkswagen has violated the Clean Air Act by deceiving eco-friendly consumers into purchasing purportedly "clean diesel" engine cars that also perform with increased efficiency, torque, and acceleration. Volkswagen's "clean diesel" cars have now been determined to be anything but clean. Defendants secretly installed "defeat" devices to bypass fuel emissions controls and installed "switch" devices to bypass EPA compliance testing. As a result of Volkswagen's illegal and clandestine practices, these Defective Vehicles in day-to-day operation spew as much as 40 times the pollution that the law allows.

2.      Like 500,000 others who purchased or leased Defective Vehicles, Plaintiffs bought a 2011 Volkswagen Jetta SportWagen TDI 2.0 precisely because Defendants touted it as an environmentally friendly car with low emissions, good mileage and better performance against the hybrids from other manufacturers they were considering. Indeed they advertised: "This ain't your daddy's diesel. Stinky, smoky sluggish. Those old diesel realities no longer apply. Enter TDI[1] Clean Diesel. Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency. We've ushered in a new era of diesel."[2] Individually and on behalf of all those similarly situated, Plaintiffs seeks redress for Defendants' fraud and deception.

### JURISDICTION AND VENUE

3.      Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because a member of the Plaintiff Class is a citizen of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

4.      The Court has personal jurisdiction over all Defendants because they regular and substantial business in the State of Illinois; they have sufficient minimum contacts the State of Illinois; and each Defendant otherwise intentionally avails itself of the markets in the State of Illinois through the promotion, marketing and sale of the Defective Vehicles thus rendering the exercise of jurisdiction by this Court permissible under Illinois law and the U.S. Constitution.

5.      The Court also has personal jurisdiction over the Volkswagen Defendants under 18 U.S.C. § 1965 because they are found or have agents or transact business in this District.

---

[1] TDI stands for turbocharged direct injection.
[2] http://www.vw.com/features/clean-diesel/ (last visited Sep. 20, 2015).

6.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District, a substantial part of the property that is the subject of this action is situated in this District, Class members residing in this district have been harmed as a result of Defendants' acts or omissions, and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## THE PARTIES

7.     Plaintiffs Brian Hellweg and Kristen Hellweg reside in the Northern District of Illinois, and are citizens of the State of Illinois. Plaintiffs purchased a 2011 Volkswagen Jetta SportWagen TDI 2.0, VIN 3VWPL7AJ9BM689118, in April 2011 at the Autobarn of Countryside Volkswagen. Plaintiffs did not know at the time they purchased the 2011 Volkswagen Jetta SportWagen TDI 2.0 that the vehicle contained a "defeat device" and "switch" that masked the real level of pollutants emitted. Plaintiffs thought they purchased an environmentally friendly car that Defendants touted as such through various forms of media, brochures, and point-of-sale advertising. Instead they purchased a polluter. Plaintiffs would not have purchased the 2011 Volkswagen Jetta SportWagen TDI 2.0 or would not have paid as much for it if she had known of Defendants' deceptive and fraudulent trade practices. Plaintiffs sustained injury-in-fact for which they are entitled to seek monetary damages.

8.     Defendant Volkswagen AG is a foreign for-profit corporation. Its principal place of business is at 38436 Wolfsburg, Germany. Volkswagen AG is one of the world's largest car manufacturers. It owns and controls the brand names Volkswagen, Rolls-Royce, Bentley, Audi, Lamborghini, Skoda and Seat. Volkswagen AG designs, manufactures, tests, markets, distributes and sells the Defective Vehicles. Volkswagen AG delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Illinois.

3

## FACTUAL ALLEGATIONS

### A.     The Clean Air Act Prohibits Defeat Devices

9.      Finding that air pollution was being caused, in part, by the increased use of cars and that this pollution was endangering the public, Congress passed the Clean Air Act ("CAA"). The purpose of the CAA was to "protect and enhance the quality of the Nation's air resources so as to promote public health and welfare" and to "prevent[] and control air pollution." CAA § 101(b)(1)-(2).

10.     The CAA and its attendant regulations, in part, aim to reduce nitrogen oxides and other pollutants emitted by automobiles to improve air quality from the deleterious effects caused by pollution.

11.     Light-duty motor vehicles, commonly known as passenger cars, are regulated by the CAA, which sets compliance provisions, and the Code of Federal Regulations, which sets emission standards and test procedures. These cars must satisfy emission standards for certain air pollutants such as nitrogen oxides.

12.     Every vehicle introduced into interstate commerce in the United States must satisfy applicable emission standards. To accomplish this, the Environmental Protection Agency ("EPA") administers a certification program and issues certificates of conformity ("COCs") to compliant vehicles. 40 C.F.R. § 86.1811-04.

13.     Auto manufacturers must submit a COC application to obtain a COC. That application must include a list of all auxiliary emission control devices ("AECDs"), which are design elements that can modulate, delay, or deactivate the operation of any part of the emission control system. Essentially, AECDs can influence or obstruct emission controls. 40 C.F.R. § 86.1803-01.

4

14.    Some AECDs are considered "defeat devices." Defeat devices reduce the effectiveness of the emission control system. 40 C.F.R. § 86.1803-01. A COC applicant must justify each AECD that reduces emission effectiveness and explain why that AECD is not a defeat device. 40 C.F.R. § 86.1844-01(d)(11).

15.    Cars with defeat devices cannot be certified because. And a COC only covers cars that conform to what was described in the manufacturer's application for the COC. 40 C.F.R. § 86.1848-10(c)(6).

16.    The CAA makes it unlawful for:

> any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knowns or should know that such part or component is being offered for sale or installed for such use or put to such use.

CAA § 203(a)(3)(B), 40 C.F.R. § 86.1854-12(a)(3)(ii).

**B.    Volkswagen's "Clean Diesel" Campaign is a Hoax; The Defective Vehicles Were Manufactured with Unlawful Defeat Devices**

17.    Beginning in model year 2009 with the VW Jetta and Jetta Sportwagen, Volkswagen embarked on a "clean diesel" campaign to sell cars with a diesel engine that it advertised as both eco-friendly and efficient. As Defendants represented in the following advertisement Volkswagen's "clean diesel" cars "don't sacrifice on performance"[3]:

---

[3] http://www.volkswagengroupamerica.com/fuel_efficiency.html (last visited Sep. 20, 2015).

## This ain't your daddy's diesel.

Stinky, smoky, and sluggish. Those old diesel realities no longer apply. Enter TDI Clean Diesel. Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency. We've ushered in a new era of diesel.

* Engineered to burn low-sulfur diesel fuel
* "Common Rail" direct injection system

View key fuel efficiency info



18.　　　Volkswagen also touted a technology called TDI – short for turbocharged direct injection – which purportedly "delivers more torque, lower fuel consumption, and reduces CO2 emissions." One of Volkswagen's chief selling points for these cars was that Volkswagen "has been at the forefront of clean diesel since the introduction of the Audi TDI technology in 2009." [4] An example of an advertisement for this technology follows:

---

[4] http://www.volkswagengroupamerica.com/clean_diesel_tdi.html (last visited Sep. 20, 2015).

7





Combining legendary performance and fuel economy, the TDI Clean Diesel is our least thirsty engine yet, delivering up to 1,235 kilometres (highway) per tank on models like the Touareg and Passat.*

**Come test drive one today.**



19. The "clean diesel" cars – also called in this Complaint the Defective Vehicles – are: Jetta (model years 2009 – 2015), Beetle (model years 2009 – 2015), Audi A3 (model years 2009 – 2015), Golf (model years 2009 – 2015) and Passat (model years 2014-2015). Although Plaintiffs purchased a 2011 Volkswagen Jetta SportWagen TDI 2.0, Volkswagen's false representations and omissions of material fact applied equally to all its "clean diesel" cars and thus to all five groups of Defective Vehicles.

20.     Volkswagen's "clean diesel" representations, albeit false, neatly matched others concerning Volkswagen's alleged environmental conscience:

> At home in America and around the world, Volkswagen Group places environmental sustainability at the core of our operating philosophy. We don't just talk about it, we take action, finding inventive ways to be responsible in everything we do – and everyone, including our employees, suppliers and sales partners, is equally committed to ongoing improvements and innovations. As a result, we are on our way toward our goal of becoming the world's most environmentally sustainable automaker by 2018.[5]

21.     Exploiting this theme, Volkswagen in 2013 alone, sold more than 100,000 "clean diesel" cars in the United States including Illinois. [6]

22.     Volkswagen further represents:

> [W]e are committed to driving progress through better- engineered, efficient vehicles that don't sacrifice performance. But it all starts with our vision for making cars greener than ever. We take steps to ensure that every vehicle we manufacture is the best it can be in terms of its environmental properties. We constantly strive to improve the efficiency and economy of our engines, minimize the power consumption of electrical components and reduce the weight of our cars.[7] We used to think of diesel as black clouds of smoke and noxious fumes. But that was then. Now we have Clean Diesel that meets the highest standards in all 50 states, thanks to ultra-low sulfur diesel (ULSD) fuel and innovative engine technology that burns cleaner.[8] With Clean Diesel Technology and ultra-low sulfur diesel fuel, we'll generate a lot less smog in the air. "Thanks," in advance, from the environment.[9]

23.     Volkswagen's "greener than ever" claims, however, cannot be reconciled with recent testing that shows the Defective Vehicles spew pollutants in amounts up to 40 times the permissible limit under the CAA.[10]

24.     A May 15, 2014 report issued by West Virginia University's *Center for Alternative Fuels, Engines & Emissions* found significantly elevated nitrogen oxides emissions when the Defective Vehicles were driven in real world conditions.

---

[5] http://www.volkswagengroupamerica.com/environment.html (last visited Sep. 20, 2015).
[6] *See* FN 4.
[7] http://www.volkswagengroupamerica.com/fuel_efficiency.html (last visited Sep. 20, 2015).
[8] http://www.clearlybetterdiesel.org/index.html#environment (last visited Sep. 21, 2015).
[9] http://www.clearlybetterdiesel.org/index.html#environment-right (last visited Sep. 21, 2015).
[10] New York Times, *Volkswagen Chief Apologizes for Breach of Trust After Recall*
http://www.nytimes.com/2015/09/21/business/international/volkswagen-chief-apologizes-for-breach-of-trust-after-recall.html?_r=0 (last visited Sep. 20, 2015).

25.     Essentially, the Defective Vehicles emit excessive and illegal amounts of pollution when driven in real world conditions, yet still manage to deceive and pass the EPA's compliance tests.

26.     To evade the EPA's test standards, Volkswagen manufactured and installed software in its Defective Vehicles that sensed when the vehicle was being tested for compliance with EPA emission standards. According to the EPA, Volkswagen created a "switch" that senses whether the vehicle is being tested based on various inputs that precisely track the EPA's emission test procedure.[11] Thus, when tested, Volkswagen's software produced compliant emission results. During normal vehicle operation, however, the "switch" activated and ran a separate calibration, called "road calibration." "Road calibration" mode reduced effectiveness of the emission control system and increased emissions of nitrogen oxides 10-40 times above EPA compliant levels.[12]

27.     Volkswagen's "road calibration" and "switch" are illegal "defeat" devices. According to the EPA, the Defective Vehicles do not conform to the specifications described in Volkswagen's COC application.  Volkswagen, therefore, violated the CAA each time it introduced a Defective Vehicle into commerce.[13]

C.     **Volkswagen Admitted the Defective Vehicles Were Made With Defeat Devices**

28.     The EPA and the California Air Resources Board ("CARB") presented emission reports to Volkswagen, which culminated in a voluntary software recall in December 2014. Yet this recall failed to remediate the pollution problem. Indeed, nitrogen oxides emissions were still "significantly higher" than expected during CARB's testing.[14]

---

[11] EPA Investigation Letter, dated September 18, 2015, at 3-4.
[12] *Id.*, at 4.
[13] *Id.*
[14] CARB Letter, dated September 18, 2015: "Re: Admission of Defeat Device and California Air Resources Board's Requests," at 2.

29.     Moreover, Volkswagen failed to adequately explain the poor performance under the CARB testing.

30.     Only when it became clear that the EPA and CARB would not approve certificates of conformity for Volkswagen's 2016 model year diesel cars, did Volkswagen "admit that it designed and installed a defeat devices in these vehicles in the form of a sophisticated software algorithm that detected when a vehicle was undergoing emissions testing."[15]

## TOLLING OF THE STATUE OF LIMITATIONS

### Fraudulent Concealment

31.     Upon information and belief, the Volkswagen Defendants have known of the defects described above since at least 2009. Defendants knew of the defects well before Plaintiffs and Class Members purchased the Defective Vehicles, and have concealed from or failed to notify Plaintiff, Class Members, and the public of the full and complete nature of the defects.

32.     Defendants intentionally concealed the defect from the public, from the Plaintiffs and from the Class until September 2015 did not fully investigate or consciously failed to investigate the seriousness of the issue.

33.     Any applicable statute of limitations has therefore been tolled by Defendants' knowledge and active concealment.

### Estoppel

34.     Defendants were and are under a continuing duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the vehicles. They actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiffs and Class Members

---

[15] EPA Investigation Letter, dated September 18, 2015, at 4.

reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

### Discovery Rule

35.     The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered in September 2015 that their vehicles were defective.

### CLASS ACTION ALLEGATIONS

36.     Plaintiffs brings this lawsuit as a class action on her own behalf and on behalf of all other persons similarly situated as members of the proposed Class, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

37.      The Classes' claims all derive directly from a single course of conduct by Defendants. This case is about the responsibility of Defendants, at law and in equity, for their knowledge, their conduct, and their products. Defendants have engaged in uniform and standardized conduct toward the Classes. They did not differentiate, in degree of care or candor, their actions or inactions, or in the content of their statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each Claim for Relief asserted by the respective Classes, the same legal standards govern. Additionally, many states share the same legal standards and elements of proof, facilitating the certification of multistate classes for some or all claims.

38.     Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 of the Federal Rules of Civil Procedure provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

39.     Plaintiffs brings this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on behalf of herself and a Nationwide Class (the "Nationwide Class") defined as follows:

> All persons or entities in the United States who purchased or leased one or more Defective Vehicles in the United States.

40.     Plaintiffs seeks to represent the following statewide class or subclass (the "Illinois Class") defined as follows:

> All persons in the State of Illinois who purchased or leased one or more Defective Vehicles in the United States.

41.     Excluded from the Classes are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates; (2) the Judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

## Numerosity and Ascertainability

42.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). Plaintiffs are informed and believe that there are nearly 500,000 Defective Vehicles nationwide, and thousands of Defective Vehicles in each of the States. Individual joinder of all Class members is impracticable.

43.     Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

44.     Each of the Classes is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by Defendants and/or third parties in the usual course of business, and within their control.

## Typicality

45.     Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by Defendants. The representative Plaintiffs, like all Class Members, has been damaged by Defendants' misconduct in that they have incurred losses relating to the defeat devices and Defendants' misrepresentations and concealments. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

## Adequacy of Representation

46.     Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

47.     Plaintiffs and her counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiffs nor counsel have interests adverse to those of the Classes.

## Predominance of Common Issues

48.     There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include the following:

      a.   Whether the Defective Vehicles contain illegal defeat devices;

      b.   Whether the defeat devices cause excessive and illegal emissions.

      c.   Whether Defendants engaged in unlawful, unfair or deceptive business practices, as alleged herein;

      d.   Whether the Defective Vehicles suffered a diminution of value as a result of Defendants' deceptive business practices;

      e.   Whether Defendants made unlawful and misleading representations or material omissions with respect to the Defective Vehicles;

      f.   Whether  Defendants represented that the Defective Vehicles have characteristics, uses, benefits or qualities that they do not have;

      g.   Whether Defendants' unlawful, unfair and deceptive practices harmed Plaintiffs and Class Members;

      h.   Whether Plaintiffs and the Class Members have been damaged by the unlawful actions of Defendants and the amount of damages to the Class;

      i.   Whether Defendants have been unjustly enriched by their conduct;

j.  Whether Plaintiffs and the Class Members are entitled to equitable relief;

k.  Whether punitive damages should be awarded; and

l.  What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants and to vindicate statutory and public policy.

## Superiority

49.   Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

50.   The prosecution of separate actions by the individual Class Members on the claims asserted herein would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for Defendants; and because adjudication with respect to individual Class Members would, as a practical matter, be dispositive of the interests of other Class Members, or impair substantially or impede their ability to protect their interests.

51.   Absent a class action, most Class Members would likely find the cost of litigating their individual claims prohibitively high and would therefore have no effective remedy at law. Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A). Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

52.     Classwide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the Class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class Members to protect their interests. Classwide relief assures fair, consistent, and equitable treatment and protection of all Class Members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Defective Vehicles.

53.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

54.     The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Mangson-Moss Warranty Act
### 15 U.S.C. §§ 2301 et seq.
### (Brought on behalf of the Nationwide and Illinois Classes)

55.     Plaintiffs bring this Claim for Relief on behalf of members of the Nationwide and Illinois Classes.

56.     Plaintiffs incorporates by reference paragraphs 1-57 above as if fully set forth herein, and further declares:

57.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

58.     The Defective Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

59.     Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

60.     Defendants are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

61.     The Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)(1) provides a claim for relief for any consumer who is damaged by the failure of a warrantor to comply with an expressed or implied warranty.

62.     Defendants provided Plaintiffs and Class Members with expressed and implied warranties of merchantability in connection with the purchase or lease of their vehicles that are warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). Defendants warranted that the Defective Vehicles were eco-friendly and fit for their ordinary purpose as passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

63.     Defendants breached these warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Defective Vehicles share common defects in that they are equipped with defeat devices. Defendants have admitted that the Defective Vehicles are defective in issuing its recalls, but the recalls are woefully insufficient to address each of the defects.

64.     In their capacity as warrantors, as Defendants had knowledge of the inherent defects in the Defective Vehicles, any efforts to limit the implied warranties in a manner that would exclude coverage of the Defective Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Defective Vehicles is null and void.

65.     The limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between Defendants and Plaintiffs and the other Class Members, as, at the time of purchase and lease, Plaintiffs and the other Class Members had no other options for purchasing warranty coverage other than directly from Defendants.

66.     The limitations on the warranties are substantively unconscionable. Defendants knew that the Defective Vehicles were defective. Defendants failed to disclose these defects to Plaintiffs and Class Members. Thus, Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

67.     Plaintiffs Class Members have had sufficient direct dealings with Defendants or their agents (dealerships) to establish privity of contract. Nonetheless, privity is not required here because Plaintiffs and Class Members are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit consumers.

68.     Pursuant to 15 U.S.C. § 2310(e), Plaintiffs is entitled to bring this class action and are not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

69.     Furthermore, affording Defendants an opportunity to cure their breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Defective Vehicle, Defendants knew, should have known, or were reckless in not knowing of their misrepresentations concerning the Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

70.     Plaintiffs and Class Members would suffer economic hardship if they returned their Defective Vehicles but did not receive the return of all payments made by them. Because Defendants have no available cure, Plaintiffs and Class Members have not re-accepted their Defective Vehicles by retaining them.

71.     Pursuant to 15 U.S.C. § 2310(d)(3), the amount in controversy of Plaintiffs and each Class member's individual claim exceeds the sum of $25. The total amount in controversy in this Class action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. The size of each plaintiff class or subclass far exceeds 100 members but the precise number of class members is entirely within the defendants' knowledge and control. Plaintiffs, individually and on behalf of the other Class Members, seeks all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and Class Members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and Class Members in connection with the commencement and prosecution of this action.

72.     Further, Plaintiffs and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1). Based on Defendants' continuing failures to fix the known defects, Plaintiffs seek a declaration that Defendants have not adequately implemented their recall commitments and requirements and general commitments to fix its failed processes, and injunctive relief in the form of judicial supervision over the recall process is warranted. Plaintiffs also seek the establishment of a Defendant-funded program for Plaintiffs and Class Members to recover out-of-pocket costs incurred.

73.     Plaintiffs also requests, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the defects. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements and expenses involved in going through the recall process.

74.     The right of Class Members to recover these expenses as an equitable matter to put them in the place they would have been but for Defendants' conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## COUNT II
### Fraud
**(Brought on behalf of the Nationwide and Illinois Classes)**

75.     Plaintiffs incorporate by reference paragraphs 1-57 above as if fully set forth herein, and further declares:

76.     Defendants have fraudulently and falsely represented that the Defective Vehicles use the "clean diesel" technology described above in a manner that complies with EPA emission standards.

77.     Defendants knowingly made false representations or material omissions regarding the nature of the Defective Vehicles.

78.    Further, as set forth above, Defendants concealed and suppressed material facts concerning the nature of the Defective Vehicles. Defendants knew that the Defective Vehicles were designed and manufactured with illegal defeat devices, but Defendants concealed those material facts. Defendants recklessly manufactured and distributed the Defective Vehicles to consumers in the United States, even though Defendants knew, or should have known, at the time of distribution, that the Defective Vehicles contained such defects. Plaintiffs and Class Members had no knowledge of these defects at the time they purchased or leased the Defective Vehicles.

79.    Plaintiffs and Class Members' Defective Vehicles were, in fact, defective at the time of purchase or lease.

80.    Defendants had a duty to disclose these material defects to Plaintiffs, Class Members, the public and the EPA, but failed to do so.

81.    Defendants had a duty to disclose the true facts about the Defective Vehicles because Defendants had superior knowledge and access to those facts, and the facts were not known to or reasonably discoverable by Plaintiffs and Class Members. Defendants knew that Plaintiffs and Class Members had no knowledge of the illegal defeat devices in the Defective Vehicles, and that neither Plaintiffs nor the other Class Members had an equal opportunity to discover the facts to inform them of those defects. Indeed, Plaintiffs and Class Members trusted Defendants not to sell or lease vehicles to them that were defective or that violated the Clean Air Act.

82.    Plaintiffs and Class Members reasonably relied on Defendants' representations that the vehicles they were purchasing, leasing, and/or retaining were free from defects and complied with Defendants' representations and warranties.

83.    The aforementioned concealment was material, because if the true facts had been disclosed, Plaintiffs and Class Members would not have bought, leased or retained their vehicles.

84. The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. Defendants each knew or recklessly disregarded that their representations and/or statements regarding the Defective Vehicles were false.

85. As a direct and proximate result of Defendants' knowingly false representations, concealment and/or suppression of facts, Plaintiffs and Class Members have sustained and will continue to sustain damages arising from the difference between the actual value of that which Plaintiffs and the Classes paid and the actual value of that which they received.

86. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

**Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), against
the Volkswagen Defendants
18 U.S.C. § 1962(c)
(Brought on behalf of the Nationwide and Illinois Classes)**

87. Plaintiffs incorporate by reference each allegation contained above as if fully set forth herein, and further declares:

88. The Volkswagen Defendants are all "persons" under 18 U.S.C. § 1961(3).

89. The Volkswagen Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Volkswagen RICO Enterprise through a pattern of racketeering activity.

90. Plaintiffs and Class members are "person[s] injured in his or her business or property" by reason of the Volkswagen Defendants' violation of RICO within the meaning of 18 U.S.C. § 1964(c).

**The Volkswagen RICO Enterprise**

91.     The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the Volkswagen RICO Enterprise:

a.      The Volkswagen Defendants, who designed, manufactured, and sold hundreds of thousands of Defective Vehicles knowing that they contained the illegal defeat devices, the scope and nature of which they concealed from and misrepresented to the public and regulators for more than a decade and still refuse to entirely acknowledge.

b.      The Volkswagen Defendants' Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates in fact in the Volkswagen RICO Enterprise to deceive Plaintiffs and Class members into purchasing defective vehicles, and actively concealing the illegal defeat devices from Plaintiffs and Class members.

c.      Dealerships that sell vehicles manufactured by the Vehicle Manufacturer Defendants, which sold or leased the Defective Vehicles containing illegal defeat devices to Plaintiffs and Class Members.

92.     The Volkswagen RICO Enterprise, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose. The Volkswagen RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

93.     While the Volkswagen Defendants participated in the conduct of the Volkswagen RICO Enterprise, they had an existence separate and distinct from the Volkswagen RICO Enterprise. Further, the Volkswagen RICO Enterprise was separate and distinct from the pattern of racketeering in which the Volkswagen Defendants have engaged.

94.     At all relevant times, the Volkswagen Defendants operated, controlled or managed the Volkswagen RICO Enterprise, through a variety of actions. The Volkswagen Defendants' participation in the Volkswagen RICO Enterprise was necessary for the successful operation of its scheme to defraud because the Volkswagen Defendants manufactured the Defective Vehicles, concealed the nature and scope of the defeat devices, and profited from such concealment.

95.     The members of the Volkswagen RICO Enterprise all served a common purpose: to sell as many vehicles containing such defeat devices, as possible, and thereby maximize the revenue and profitability of the Volkswagen RICO Enterprise's members. The members of the Volkswagen RICO Enterprise shared the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. Each member of the Volkswagen RICO Enterprise benefited from the common purpose: the Volkswagen Defendants sold more Defective Vehicles than they would have otherwise had the scope and nature of the defeat devices not been concealed; and the dealerships sold and serviced more Defective Vehicles, and sold or leased those vehicles at a much higher price, as a result of the concealment of the scope and nature of the defeat devices from Plaintiffs and Class members.

## Pattern of Racketeering Activity

96.     The Volkswagen Defendants conducted and participated in the conduct of the affairs of the Volkswagen RICO Enterprise through a pattern of racketeering activity, beginning no later than 2009 and continuing to this day, that consists of numerous and repeated violations of the federal mail and wire fraud statutes. These statutes prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

97. For the Volkswagen Defendants, the purpose of the scheme to defraud was to conceal the scope and nature of the illegal defeat devices found in hundreds of thousands of Defective Vehicles worldwide in order to sell more vehicles, to sell them at a higher price or for a higher profit, and to avoid incurring the expenses associated with repairing the defects. By concealing the scope and nature of the illegal defeat devices in the Defective Vehicles, the Volkswagen Defendants also maintained and boosted consumer confidence in the "clean diesel" campaign, and avoided remediation costs and negative publicity, all of which furthered the scheme to defraud and helped the Volkswagen Defendants sell more vehicles than they would otherwise have sold, and to sell them at a much higher price or for a higher profit.

98. As detailed in the General Factual Allegations, the Volkswagen Defendants were well aware of the defeat devices, but intentionally subjected Plaintiffs and Class Members to those defects in order to maximize their profits. Moreover, once the defect became known, the Volkswagen Defendants failed to adequately remedy the defect: pollution emissions were still too high.

99. To further the scheme to defraud, the Volkswagen Defendants repeatedly misrepresented and concealed the nature and scope of the defeat devices defect. The Volkswagen Defendants passed off a substandard recall but failed to adequately remedy the nature of the defect.

100. To further the scheme to defraud, the Volkswagen Defendants concealed the nature and scope of the defeat devices defect from federal regulators, enabling it to escape investigation and costs associated with recalls and corrective action.

101. To further the scheme to defraud, the Volkswagen Defendants would promote and tout the reliability, and quality of the vehicles while simultaneously concealing the nature and scope of the defeat devices defect.

102.    To further the scheme to defraud, the Volkswagen Defendants permitted or caused the Dealerships to promote the reliability, and quality of the purported eco-friendly nature of the Defective Vehicles while simultaneously concealing the nature and scope of the defeat devices defect.

103.    To carry out, or attempt to carry out the scheme to defraud, the Volkswagen Defendants have conducted or participated in the conduct of the affairs of the Volkswagen RICO Enterprise through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

a.    The Volkswagen Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including the Volkswagen website, communications with the EPA and/or CARB statements to the press, and communications with other members of the Volkswagen RICO Enterprise, as well as advertisements and other communications to the Volkswagen Defendants' customers, including Plaintiffs and Class members. Given that each Defective Vehicle required a COC application, the Volkswagen Defendants used the mail and wires 30 times, at minimum, to submit the fraudulent COC applications; and

b.    The Volkswagen Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

104.    The Volkswagen Defendants' pattern of racketeering activity in violation of the mail and wire fraud statutes included transmitting or causing to be transmitted, by means of mail and wire communication traveling in interstate or foreign commerce, between its offices in Germany, Virginia, Michigan or among the other 20-plus offices in the United States: communications concerning the illegal defeat devices; and submissions to the EPA regarding COC applications for each model and year of the Defective Vehicles that failed to adequately disclose or address all auxiliary emission control devices that were installed in the Defective Vehicles.

105.    The Volkswagen Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs and Class Members were directly harmed as a result of the Volkswagen Defendants' intentional conduct. Plaintiff, Class Members, and federal regulators, among others, relied on the Volkswagen Defendants' material misrepresentations and omissions.

106.    The Volkswagen Defendants engaged in a pattern of related and continuous predicate acts beginning at least in 2009. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and Class Members and obtaining significant monies and revenues from them while providing Defective Vehicles worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

107.    The predicate acts all had the purpose of generating significant revenue and profits for the Volkswagen Defendants at the expense of Plaintiffs and Class Members. The predicate acts were committed or caused to be committed by the Volkswagen Defendants through their participation in the Volkswagen RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiff's and Class Members' funds and avoiding the expenses associated with remediating the defect.

108.    By reason of and as a result of the conduct of the Volkswagen Defendants, and in particular its pattern of racketeering activity, Plaintiffs and Class Members have been injured in their business and/or property in multiple ways, including but not limited to:

a.      purchasing or leasing Defective Vehicles that Plaintiffs and Class Members would not otherwise have purchased or leased;

b.      overpaying for leased or purchased Defective Vehicles, in that Plaintiffs and Class Members believed they were paying for "green" eco-friendly vehicles but obtaining vehicles that were neither "green" nor eco-friendly; and

c.      purchasing Defective Vehicles of diminished values, thus reducing their resale value.

109.    The Volkswagen Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and Class Members, and Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT IV
**Unjust Enrichment**
**(Brought on behalf of the Nationwide and Illinois Classes)**

110.    Plaintiffs incorporate by reference the allegations in paragraphs 1-57 above as if fully set forth herein, and further states:

111.    As a result of Defendants' unlawful and deceptive actions described above, Defendants were enriched at the expense of Plaintiffs and the Class.

112.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits it received from Plaintiffs and Class Members. Thus, it would be unjust and inequitable for Defendants to retain the benefit without restitution to Plaintiffs and the Class for the monies paid to Defendants for the Defective Vehicle.

### COUNT V
**Violation of Illinois' Consumer Fraud and Deceptive Business**
**Practices Act 815 ILCS 505/1**
**(Brought on behalf of the Illinois Class)**

113.    Plaintiffs incorporate by reference the allegations in paragraphs 1-57 above as if fully set forth herein, and further states:

114.    This is an action for damages for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505/1 ("ICFDBPA").

115.     ICFDBPA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

116.     ICFDBPA prohibits, 815 ILCS 510/2, prohibits deceptive trade practices, including among others, "(2) caus[ing] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; ... (5) represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have ...; (7) represent[ing] that goods or services are of a particular standard, quality, or grade ... if they are of another; ... (9) advertis[ing] goods or services with intent not to sell them as advertised; ... [and] (12) engag[ing] in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

117.     Defendants are "persons" as that term is defined in 815 ILCS 505/1(c).

118.     Manufacturing, selling, distributing, or introducing the Defective Vehicles in interstate commerce are transactions in trade or commerce in the scope of ICFDBPA.

119.     Plaintiffs and the Illinois Sub-Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

120.     The Defective Vehicles are goods within the meaning of FDUTPA and Defendants are engaged in trade or commerce within the meaning of ICFDBPA.

121.     Defendants' unfair and deceptive practices are likely to mislead – and have misled – reasonable consumers, such as Plaintiffs and members of the Class, and therefore, violate ICFDBPA.

122. Defendants have violated ICFDBPA by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.

123. Specifically, Defendants has by affirmative misrepresentations and omissions of material fact represented and led Plaintiffs and the Class Members to believe that the Defective Vehicles are eco-friendly and comply with federal emission standards, when in fact the Vehicles are engineered to "switch" off the pollution compliant technology, as Defective Vehicles contain illegal defeat devices.

124. Plaintiffs and the Class have been aggrieved by Defendants' unfair and deceptive practices in violation of ICFDBPA, in that they purchased or leased Defendants' Defective Vehicles.

125. Reasonable consumers rely on Defendants to honestly represent and not conceal the true nature of their vehicles.

126. Defendants have deceived reasonable consumers, like Plaintiffs and the Class, into believing the vehicles were eco-friendly when they were not.

127. The knowledge required to discern the true nature of the defect is beyond that of the reasonable consumer.

128. Plaintiffs and the Class have sustained damages as a direct and proximate result of Defendants' tortious conduct. Had the defects been properly disclosed the Illinois Class would not have bought, leased or retained their vehicles, or they would have purchased or leased the vehicles for less than they did.

129.    Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Illinois Sub-Class seek monetary relief against Defendants in the amount of actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or were grossly negligent.

130.    Plaintiffs also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq.*

## PRAYER FOR RELIEF

Plaintiffs, on behalf of herself and all others similarly situated, requests the Court to enter judgment against the Defendants, as follows:

**A.**    An order certifying the proposed Classes designating Plaintiffs as the named representative of the Classes, and designating the undersigned as Class Counsel;

**B.**    A declaration that the Defective Vehicles are defective;

**C.**    A declaration that the Defendants are financially responsible for notifying all Class Members about the defective nature of the Defective Vehicles;

**D.**    An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Defective Vehicles, and directing Defendants to permanently, expeditiously, and completely repair the Defective Vehicles to eliminate the illegal defeat devices;

**E.**    An award to Plaintiffs and Class Members of compensatory, exemplary, and statutory penalties, damages, including interest, in an amount to be proven at trial;

**F.**    An award to Plaintiffs and Class Members for the return of the purchase prices of the Defective Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

**G.**    A declaration that the Defendants must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Defective Vehicles, or make full restitution to Plaintiffs and Class Members;

**H.**    An award of attorneys' fees and costs, as allowed by law;

**I.**    An award of prejudgment and post judgment interest, as provided by law;

**J.**    Leave to amend this Complaint to conform to the evidence produced at trial; and

**K.** Such other and further relief as the Court deems appropriate under the circumstances.

## **JURY TRIAL DEMAND**

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: September 23, 2015

Respectfully submitted,

s/Todd A. Smith
Todd A. Smith
Brian LaCien
Carolyn Daley Scott
Power Rogers & Smith P.C.
70 W Madison Suite 5500
Tel: 312-236-9381
Fax: 312-236-0920
tsmith@prslaw.com
blacien@prslaw.com
cdaley@prslaw.com

*Attorneys for Plaintiff and the Class*